UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE KAYO CORP.,

                    Plaintiff,

v.

FILA U.S.A., INC.,

                    Defendant.

Case No. 18-cv-03981-AKH

**JUDGMENT AGAINST
FILA U.S.A., INC.**

This matter having come before the Court for trial pursuant to Rule 52(a) of the Federal Rules of Civil Procedure on July 6, 2022, both parties appearing by counsel, the Court having reviewed the pleadings filed herein and the evidence before the Court and heard arguments of counsel, all as set forth in the July 6, 2022 transcript attached hereto as **Exhibit A**, and the Court being fully advised of all relevant information and evidence, and having entered its findings of fact and conclusions of law on the record; now, therefore, it is:

**ADJUDGED AND DECREED** that Plaintiff The Kayo Corp. ("Plaintiff") is granted Judgment against Defendant Fila U.S.A., Inc. ("Defendant" and/or "Fila") and Judgment is hereby entered in the amount of $732,666.00 plus nine (9) percent interest in the amount of $177,116.00 making the total amount of the Judgment $909,776.00.  Plaintiff will also be awarded costs as the prevailing party to be taxed by the Clerk on notice.

ENTER:

 /s/ Alvin K. Hellerstein
_____
Alvin K. Hellerstein
U.S. District  Judge

Dated: _____August 1_____, 2022

# EXHIBIT A

M76CkayC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

THE KAYO CORP.,

                    Plaintiff,

          v.                              18 Civ. 3981 (AKH)

FILA U.S.A., INC.,

                    Defendant.

------------------------------x

                                    New York, N.Y.
                                    July 6, 2022
                                    2:34 p.m.

Before:

                    HON. ALVIN K. HELLERSTEIN,

                                        District Judge

                              APPEARANCES

FOSTER GARVEY PC
     Attorneys for Plaintiff
BY:  ANDREW J. GOODMAN

ARENT FOX LLP
     Attorneys for Defendant
BY:  KATHLEEN R. HEILMAN

M76CkayC

```
 1              (Case called)
 2              MR. GOODMAN:  For plaintiff, Andrew Goodman, Foster
 3    Garvey.
 4              Your Honor, would you prefer with or without masks?
 5              THE COURT:  If you are comfortable without masks, I
 6    would rather without masks.
 7              So it's Andrew Goodman for the plaintiff, Kayo?
 8              MR. GOODMAN:  Yes, your Honor.
 9              THE COURT:  And Katie Heilman for the defendant, Fila?
10              MS. HEILMAN:  That's correct, your Honor.
11              THE COURT:  So let me work out some ground rules with
12    you.  The closest analogy to what we're doing is a summary
13    trial.  I've told you before that you folks are both ready for
14    trial, you've gone through mediation without success.  I told
15    you that because of a jam-up of criminal trials, it will be
16    well into the fall and perhaps the winter before I could reach
17    you, so I suggested this procedure, the form of a summary
18    trial.
19              I thought that the following might be a good way to
20    go:  Mr. Goodman will go first for half hour, Ms. Heilman will
21    then go for a half hour, you'll each have 15 minutes to rebut
22    the other, and I'll be making comments interspersed along the
23    way.
24              What is it that you would like from me, Mr. Goodman?
25              MR. GOODMAN:  A judgment, your Honor, in the sum of
```

M76CkayC

1    one million --

2              THE COURT:  No, I know your addendum.  At the end of

3    today, should I be declaring a judgment for one side or the

4    other?  I think not.

5              MR. GOODMAN:  I think, your Honor, what would be most

6    helpful would be a determination that the contract required

7    notice of default, which was not given.

8              THE COURT:  That's the key issue of the case?

9              MR. GOODMAN:  Yes, your Honor.

10             THE COURT:  Do you want me to deliver that without

11   witnesses?

12             MR. GOODMAN:  Yes, your Honor.

13             THE COURT:  How about you, Ms. Heilman?

14             MS. HEILMAN:  I think, your Honor, that ruling that

15   the plaintiff's performance was not reasonable and that the

16   plaintiff failed to perform --

17             THE COURT:  Well, you want me to determine the case,

18   also?

19             MS. HEILMAN:  I believe you can.  I think, typically,

20   that's a fact issue.  I think here, the record is relatively

21   black and white and you could make that determination based on

22   the evidence that we present today.

23             THE COURT:  Will there be any credibility issues?

24             MS. HEILMAN:  I don't believe so.  I think you could

25   make that determination based on the documents, determine that

1    there was no performance, and that the agreement automatically

2    terminated or was abandoned.

3         THE COURT:  In other words, you want me to make the

4    factual determinations, if I'm able to, from your delivery of

5    your arguments at the end of the day, in effect turning this

6    into a bench trial on a Rule 52 type of findings of fact and

7    conclusions of law at the end of it.

8         MR. GOODMAN:  Your Honor, from plaintiff's

9    perspective, there are factual issues as to performance, if you

10   get to performance.  If you find on the absence of notice, you

11   don't have to get to performance, but if your Honor finds that

12   notice was either not required or given, then we do get to the

13   performance issues, your Honor.  There we do have live

14   testimony.

15        THE COURT:  I take it from what you want is that both

16   of you would like me, if I can, to make whatever determinations

17   I'm able to make on the basis of the record you present today.

18   If I can't rule, just figure out then what we do with those and

19   how we will proceed.

20        Is that satisfactory, Mr. Goodman?

21        MR. GOODMAN:  Yes, your Honor.

22        THE COURT:  And Ms. Heilman?

23        MS. HEILMAN:  Yes, your Honor.

24        THE COURT:  The next thing I want from both of you,

25   because this is not an ordinary way of proceeding, is a

M76CkayC

1  statement that you will not seek to recuse me on the basis of

2  knowledge that I'm acquiring today.

3      MR. GOODMAN:  Your Honor, plaintiff definitely will

4  not seek to recuse you based on today's proceeding.

5      THE COURT:  Ms. Heilman.

6      MS. HEILMAN:  I will not, as well.

7      THE COURT:  Okay.  So then we can proceed.

8      I do not plan to conduct any mediations with you today

9  or maybe ever, and nothing will be *ex parte*.  So everything

10  will be in open court and on the record.

11      So why don't we begin with Mr. Goodman.  You have a

12  half hour.  It is now twenty minutes to 3:00.

13      MR. GOODMAN:  May I sit, your Honor, or should I

14  stand?

15      THE COURT:  Whatever is more convenient to you.

16      MR. GOODMAN:  Okay.  It will be easier, given my

17  glasses and the documents, to sit.

18      THE COURT:  It's okay with me.

19      MR. GOODMAN:  Thank you, your Honor.

20      So obviously the place where we start is the agreement

21  itself.  The agreement is in the binder we have given your

22  Honor, which is the one with the orange cover.

23      THE COURT:  I have the agreement.

24      MR. GOODMAN:  We are dealing with paragraph 2.1, that

25  *proviso* that begins the last three lines of page 2.  With

M76CkayC

1    respect to Zumiez, Pacific Sunwear, and Tilly's.  The licensor

2    shall have the right to sell -- licensor would be Fila.  Fila

3    shall have the right to sell products branded with the Fila and

4    F-Box trademarks that are not intended specifically for the

5    skateboarding market so long as the licensor consults with the

6    licensee prior to any sale being made and licensee shall be

7    entitled to a commission of 7 percent of the net purchase price

8    received by licensor.

9            The parties understood that this required Fila to go

10   through Kayo to get to those three outlets.  On document No. 6

11   in the binder, your Honor, is a series of emails, I would like

12   to point your Honor to the second page that bears Bates number

13   Fila 000461.

14            THE COURT:  This is tab 6?

15            MR. GOODMAN:  Yes, your Honor.

16            THE COURT:  All right.

17            MR. GOODMAN:  Actually, I'm sorry.  Wrong email.  I

18   want to get to that one later.  I want to look at the January

19   18th email.

20            THE COURT:  Which one?

21            MR. GOODMAN:  January 18th, 2015.

22            THE COURT:  How many pages is it?

23            MR. GOODMAN:  I'm sorry.  I'm not off to a great start

24   here.  Let me then go to number 40, page 2.

25            THE COURT:  You want me to go to tab 40?

M76CkayC

1          MR. GOODMAN:  40, yes.  You will see from that tab

2     that in January and February of --

3          THE COURT:  You should have done this electronically

4     rather than these cumbersome books.

5          MR. GOODMAN:  Sorry, your Honor.

6          THE COURT:  Okay.  I've got 40.

7          MR. GOODMAN:  On the second page of 40 is an email,

8     dated January 25th, 2016, from Jennifer Estabrook, who was at

9     that point in time the general counsel and COO of Fila, and

10    they're in the middle of negotiating in January of 2016 with a

11    sales rep that would cut out Kayo from a number of possible

12    accounts.  On January 25th, Ms. Estabrook wrote --

13         THE COURT:  Don't you think it would make more sense

14    to start with the agreement itself and what you consider was a

15    breach?  There was a notice of termination that was sent via

16    Fila.

17         MR. GOODMAN:  Correct.

18         THE COURT:  Fila contends that it sent it because they

19    were non-curable breaches.  You contend that it was an

20    improvident sending, a breach of contract by Fila.  That's the

21    major issue of this case.

22         MR. GOODMAN:  Yes, your Honor.

23         THE COURT:  So why don't we focus on the major issue

24    of this case.

25         MR. GOODMAN:  Yes, your Honor.  So that's paragraph

M76CkayC

1    15.2 of the agreement.

2            THE COURT:  Okay.  So what was the termination?  I'd

3    like to see what, in effect, was the termination.

4            MR. GOODMAN:  The termination is a February 10th, 2017

5    email in our book at 1B, as in boy.

6            THE COURT:  In 1B?

7            MR. GOODMAN:  B as in boy, your Honor.

8            THE COURT:  I have it.  And it reads, by Jennifer

9    Estabrook, chief operating officer of Fila, writing to the

10   president, Troy Morgan, of Kayo.  Dear Troy, the purpose of

11   this letter is to notify you that pursuant to section 15.2(i)

12   of the agreement --

13           And let's look at 15.2(i) of the agreement to see what

14   it says.  A licensee sells products outside the territory.

15   That's 15.2(i).  That, pursuant to that section, Fila is

16   exercising its right to immediately terminate the agreement as

17   a result of Kayo's complete failure to exercise any of its

18   rights or fulfill any of its obligations under the agreement

19   for a period of over 18 months.  During this period,

20   representatives of Fila attempted numerous times to contact

21   you, your lawyer, and your finance team and received no

22   response.  At this point, these breaches are not capable of

23   being cured.  Given these breaches of the agreement and Kayo's

24   complete lack of business etiquette, there is simply no

25   interest or appetite to try to build a relationship with you or

M76CkayC

1    your company.

2            Maybe let me change this procedure and just ask now,

3    Ms. Heilman, these questions.

4            Was 15.2 a mistake?

5            MS. HEILMAN:  Actually, there are two 15.2(i)'s.

6    There is, if you look up into the body of the paragraph that

7    starts:  "Licensor may terminate," you'll see romanette (i),

8    immediately upon any material breach of any --

9            THE COURT:  I need to regulate the sound.

10            (Pause)

11            Licensor may terminate this agreement, and the license

12    is granted hereunder, immediately upon any material breach of

13    any of the provisions hereof by licensee which is not capable

14    of being cured.

15            Now, you're saying that because Kayo did not — and you

16    don't say why — exercise any of its rights or fulfill any of

17    its obligations for a period of over 18 months, shouldn't you

18    have given a notice to cure?

19            MS. HEILMAN:  There are actually two possible grounds

20    for termination.  So that was the provision that was

21    referenced.

22            THE COURT:  Well, that's the only provision that

23    counts then.

24            MS. HEILMAN:  So in Fila's view, by this point, it was

25    18 months into an agreement term that contemplated certain work

M76CkayC

1    that was going to be done by Kayo.

2              THE COURT:  Isn't this a situation of right to cure?

3              MS. HEILMAN:  No.  I believe -- Fila does not believe

4    that there was --

5              THE COURT:  I know, but what did the agreement say?

6              MS. HEILMAN:  There is no obligation to provide a

7    notice to cure.

8              THE COURT:  Part 2 says, upon any material breach of

9    any of the provisions hereof by licensee which is capable of

10   being cured and is not cured within 45 days.

11             So how about 4, licensee fails to submit to licensor

12   for its prior approval any product advertising material or

13   plan.

14             MR. GOODMAN:  That's explicitly --

15             THE COURT:  Cease, Mr. Goodman.

16             MR. GOODMAN:  I apologize.  I thought your Honor was

17   done.

18             THE COURT:  Number 6, licensee fails to fulfill any

19   other material obligations it may have, and it specifics which

20   ones.

21             MS. HEILMAN:  I agree with that is what the agreement

22   says.  I think those are examples of what constitute

23   non-curable material breaches.  I don't know that the agreement

24   says that a non-curable breach is defined as the following.

25             There is also a provision on the following page,

M76CkayC

1    section 15.4.

2         THE COURT:  Can I read this language.  The following

3    constitute a non-curable material breach.  Is that not a

4    covenant or is it just a preparatory wish?

5         MS. HEILMAN:  It's an example of what constitutes a

6    non-curable material breach.  Here, the conduct went beyond --

7         THE COURT:  It doesn't say example.  It doesn't say

8    for example.

9         MS. HEILMAN:  It does not say defined as.

10        THE COURT:  Following a non-curable material breach.

11        MS. HEILMAN:  I agree there is some ambiguity.  I

12   would point out that the failure to submit product advertising

13   materials or plans was not the only issue here.  There was

14   several other issues of complete and utter failure to

15   communicate for an 18-month period.

16        THE COURT:  Are you not bound by the notice of

17   termination you give?

18        MS. HEILMAN:  I believe that the Court could also find

19   an alternative ground for termination under section 15.4, which

20   is automatic termination provision based on the record

21   evidence.

22        THE COURT:  Let's read it.  There is three sections

23   under there, and 4 is blank.  Which subsection are you relying

24   on?

25        MS. HEILMAN:  Subsection 3.

M76CkayC

1      THE COURT:  Either party becomes unable to pay its

2   debts as they fall due or becomes unable in the other party's

3   reasonable opinion to fulfill all of its material obligations

4   thereunder.  Is that what you're working on?

5      MS. HEILMAN:  The second clause, in the other party's

6   reasonable opinion could not fulfill all of its material

7   obligations.

8      THE COURT:  So you then have the obligation to show

9   that your termination was reasonable, right?

10      MS. HEILMAN:  I believe the plaintiff has the

11   obligation to prove that their performance was reasonable.

12      THE COURT:  No.  No.  The way I read it is it's an

13   exception.  Either party becomes unable to pay its debts as

14   they fall due, or becomes unable in Fila's reasonable opinion

15   to fulfill all of its material obligations thereunder.  Since

16   it's your reasonable opinion that counts, you have the burden.

17      MS. HEILMAN:  Correct.

18      THE COURT:  So why don't we let Ms. Heilman then speak

19   about how she will prove that her opinion that the notice of

20   termination was reasonable.

21      MS. HEILMAN:  So I think it might be helpful to step

22   back and talk about the nature of the arrangement generally and

23   what was sort of bargained for here.

24      So you have, under the agreement --

25      THE COURT:  Don't we find this in the agreement

1    itself?

2           MS. HEILMAN:  Yes, we will find this in the agreement

3    itself.

4           THE COURT:  Because the agreement says it's the entire

5    agreement, doesn't it?

6           MS. HEILMAN:  It does.

7           THE COURT:  The cause is 18.4.  This agreement sets

8    forth the entire agreement and the standing with respect to the

9    business hereby contemplated by and between the parties.  This

10   agreement shall not be altered or amended except by writing

11   duly executed by the parties.

12          So we have to find the obligation that has not been

13   performed within the four corners of this agreement.

14          MS. HEILMAN:  So I would refer back to section 2.1,

15   which is grant of licenses.  That is where Fila granted Kayo

16   the exclusive nontransferable right and license to use the

17   Skate Trademark in connection with the manufacturer marketing

18   and sale of the products, and the products is defined above in

19   section 1.10, products shall mean products branded with a Skate

20   Trademark.

21          THE COURT:  Set forth in Schedule A.  Schedule A says,

22   street and skateware apparel limited to short-sleeve T-shirts,

23   long-sleeve T-shirts, jackets, sweatshirts, sweatpants, pants,

24   shorts and footwear in all cases branded Fila Skateboarding.

25          MS. HEILMAN:  Correct.

M76CkayC

1          THE COURT:  So I guess it's failure to make progress

2    on these products.  Is that what we're talking about?

3          MS. HEILMAN:  Yes, this was to be a completely new

4    product line for Fila.  Fila had never before ventured into the

5    skate market.

6          THE COURT:  So working with Kayo is that Kayo had

7    considerable experience in the skate market?

8          MS. HEILMAN:  Correct.  So Fila is a very experienced

9    licensor, it's a licensed business, it routinely works with

10   licensees to market its products.

11         THE COURT:  So what did Kayo fail to do?

12         MS. HEILMAN:  Kayo failed to develop, market, or sell

13   any products.

14         THE COURT:  Is there a provision here that gives a

15   time period?

16         MS. HEILMAN:  There isn't, but the law requires that

17   when you have an exclusive license that contemplates the

18   payment of royalties, you have a duty to act reasonably because

19   you're essentially excluding the licensor from the market and

20   they're expecting profits in return, royalty payments.  So

21   there is an abundance of case law, as I'm sure you're well

22   aware, that requires the licensee to engage in reasonable

23   efforts to develop in market and sell the licensed products.

24         THE COURT:  At any point in time, did you write a

25   letter to Kayo complaining about its lack of performance?

1          MS. HEILMAN:  They did reach out.  There was at least

2     one email about a year into the agreement where the then

3     general counsel, who is now Fila's president, reached out and

4     asked for who is the contact for royalty reporting.

5          THE COURT:  Can you point me to that email?

6          MS. HEILMAN:  Sure.  Tab 42.

7          THE COURT:  Your book?

8          MS. HEILMAN:  My book.

9          MR. GOODMAN:  It is also in ours, your Honor.

10          THE COURT:  I haven't ruled yet.  You're not supposed

11     to duplicate exhibits.

12          What do you want me to read?

13          MS. HEILMAN:  So the email is just what's on this

14     page, your Honor.  It's from Jennifer Estabrook, dated May

15     23rd, 2016, which was about one year into the agreement term —

16     the agreement was effective as of June 15th, 2015 — saying can

17     you please let me know who the contact is at Kayo for royalty

18     reporting.  Ms. Estabrook testified that in her experience,

19     this is the apparatus of communication between the licensor and

20     the licensee, is the royalty report.  By this point, they have

21     heard nothing from Kayo.  A year into the agreement, she sent

22     this email and received no response.

23          THE COURT:  I can't hold this is any kind of a notice

24     of poor performance, not from this document.

25          Are there any other documents?

M76CkayC

1          MS. HEILMAN:  There were also other indicators that
2      there was nothing happening with this contemplated skate line.
3          THE COURT:  For example.
4          MS. HEILMAN:  There was no social media activity.
5          I want to also direct your Honor to some other
6      provisions of the agreement.
7          The agreement at section 5.2 contemplated that
8      licensees shall deliver to licensor for its approval one
9      concept design or color sketch of each product to be
10     distributed by licensee hereunder.  That never happened.  It's
11     an admission, Kayo's witnesses admitted that no concept
12     designs, sketches, product samples.  This provision also
13     references product samples being provided.  None of those
14     things were provided.
15         THE COURT:  Did you ever complain?
16         MS. HEILMAN:  They did not, your Honor, to -- I mean,
17     in Fila's experience, the way that the licensing agreement
18     works is that it's typically the licensee that has a sense of
19     urgency and is pushing to get products approved and is in
20     constant contact trying to collaborate with Fila, presenting
21     designs for its approval.  They're very eager to generate
22     sales.
23         THE COURT:  It may be, but that sentence is not a
24     non-curable breach that's curable within 45 days, and if there
25     isn't a cure within 45 days, you have a right to terminate.

M76CkayC

1     The separate sentence reads, upon request, Kayo shall deliver

2     to Fila for its approval one current production sample of such

3     requested product together with the tags, labels, and packaging

4     to be used in connection therewith.

5               Is there proof of any request made by Fila?

6               MS. HEILMAN:  No, there was not a request made.  But

7     as I mentioned, in Fila's experience, it's the licensee that

8     does the work, which distinguishes a license arrangement from a

9     distribution arrangement.

10              THE COURT:  This is the specific covenant under the

11    agreement which is curable, which you did not give notice to

12    cure.

13              MS. HEILMAN:  There is also a provision -- the

14    following provision is a requirement that the licensee submit

15    proposed advertising materials to the licensor for approval.

16    That also never happened.

17              THE COURT:  Upon request.

18              MS. HEILMAN:  And in section 4.1, the licensee --

19              THE COURT:  Before you finish with 5.2, it

20    specifically says Fila's request, doesn't it?

21              MS. HEILMAN:  5.3 does not say that.

22              THE COURT:  Under upon request, Kayo shall deliver to

23    Fila for its approval, et cetera.

24              MS. HEILMAN:  Production sample.  I'm sorry.  Not the

25    following sentence, the following paragraph, 5.3.

1          THE COURT:  Within a reasonable period of time prior

2     to the dissemination of any advertising material, licensee

3     shall submit such proposed advertised material to licensor for

4     approval.

5          So if you didn't get it, you had to ask.

6          MS. HEILMAN:  That is not Fila's --

7          THE COURT:  With notice, that's curable.

8          MS. HEILMAN:  That's not their experience with dozens

9     other licensees worldwide and decades of experience.  They

10     don't follow up and sort of chase licensees.  The expectation

11     is that the licensee will do the work to generate the products

12     and generate the sales.

13          THE COURT:  Mr. Goodman, what in this document makes

14     this a curable breach?

15          MR. GOODMAN:  Everything is a curable breach except

16     for those that are non-curable 1, 2, and 3.

17          THE COURT:  Let's read it together.  15.2, is it?

18          MR. GOODMAN:  Yes, your Honor.

19          THE COURT:  Immediately upon any material breach of

20     any of the provisions hereof by licensee which is not capable

21     of being cured.

22          I can't hold that failures of 5.2 and 5.3 are not

23     curable.

24          MR. GOODMAN:  That's correct, your Honor.

25          THE COURT:  Ms. Heilman.

M76CkayC

```
 1          MS. HEILMAN:  I'm sorry.  I didn't quite catch what

 2   you said.

 3          THE COURT:  I can't hold that any obligation of a

 4   product of Kayo to be deformed under 5.2 or 5.3 is a

 5   non-curable obligation.  If there is a failure to perform,

 6   there is an obligation to give notice to cure before you

 7   terminate.

 8          MS. HEILMAN:  Which specific provision, are you

 9   referring to 5.2(iv)?

10          THE COURT:  The ones you were talking about, 5.2, 5.3.

11          MS. HEILMAN:  Also, I just wanted to call your

12   attention to one other provision that's made explicit, that's

13   the licensee in section 4.1, licensee shall use commercially

14   reasonable efforts.

15          THE COURT:  Licensee shall only be permitted to sell

16   the products in the authorized distribution channels.  I think

17   that's section D, right?

18          MS. HEILMAN:  Section 4.1.

19          THE COURT:  The authorized distribution channels on

20   the list of companies that are set out in schedule B.

21          MS. HEILMAN:  That's right.

22          THE COURT:  Licensee shall use commercially reasonable

23   efforts to market the products and the collaboration with

24   licensor in store, online, and through its traditional and

25   social media activities.
```

M76CkayC

1      Again, this is curable.  Under the regime of the

2  contact, Kayo is entitled to a 45-day right of cure, and if it

3  doesn't accomplish what it has to accomplish in 45 days, you

4  have an absolute right to terminate, but you didn't give that.

5      MS. HEILMAN:  Correct.  There were a number of other

6  issues beyond just the failure to present the product designs.

7  There was, as I mentioned, no apparent outward signs that they

8  were doing any business.

9      Another big issue is that Kayo, during the agreement

10  negotiations, represented that it had these flagship retail

11  stores in these prominent locations that would be a very

12  significant source of significant distribution channel for the

13  skate products that would be developed.

14      THE COURT:  Excuse me.  On a schedule B, you both

15  agreed on the stores, whether flagship or not flagship, there

16  is a long list of stores, covering several pages.

17      MS. HEILMAN:  There is an offering memorandum provided

18  to Fila during the negotiations that made these representations

19  about the store.  Fila's witness testified that she understood

20  that the store was going to be implicit in the arrangement.

21  The store closed right after the agreement was signed and Kayo

22  never notified Fila of the store closing.

23      THE COURT:  May I see it?

24      MS. HEILMAN:  The offering memorandum?  Tab 12.

25      THE COURT:  I have it.  It's an email from Simon

M76CkayC

Grensted of Kayo to Jennifer Lopez of Fila.

Here is the corporate profits document I had mentioned. Directing them to our website may be of use, also, but I will leave that for you to decide. I should have the next term of the agreement to you by tomorrow. Looks like we are really close. I don't think any contention items remain. I look forward to hearing how it goes with the online skating company.

MS. HEILMAN: The attachment is the document that I was referencing that made representations about the prominence of the store.

THE COURT: Where do I find that?

MS. HEILMAN: The very next page that was attached to that email.

THE COURT: It's a blurb about the Kayo corp.

MS. HEILMAN: Correct. The third paragraph is where it talks about how it recently opened a flagship retail store in a highly visible location ripe with potential. Further secures --

THE COURT: What does this have to do with anything?

MS. HEILMAN: This was part of the discussions and of the agreement, that it had this flagship store, it had this ability to distribute these products. So it was extremely concerning when Fila learned that the store was closed unbeknownst to Fila, and Kayo didn't communicate that to Fila.

M76CkayC

1          THE COURT:  Did you give them a notice of cure that

2     you have to make up for what you sold here in other places?

3          It's plain to me, Ms. Heilman, that you didn't operate

4     pursuant to the agreement, that you gave a hasty termination

5     when there was a right to cure.  I mean, you can go through

6     example after example, but they all come down to the same

7     thing, all these are curable.  They may not have been able to

8     cure, but they had a 45-day right to try, and that they were so

9     incapable of doing anything, that had to be recited.  They had

10    to have a chance to show that they could do it.

11         MS. HEILMAN:  That would potentially read the section

12    15.4 automatic termination provision out of the agreement

13    because it realizes that that provision contemplates that there

14    are some circumstances that are so exceptional and so beyond

15    the pail of the licensor's experience where, if there is

16    nothing happening, there is no communication, there is no

17    outward sign of any business.  Another indication is that Fila

18    heard that there was some financial difficulty that Kayo was

19    experiencing, lack of financing --

20         THE COURT:  Let's let Mr. Goodman answer that.

21         What was Kayo doing during the first year of this

22    agreement?

23         MR. GOODMAN:  Kayo was doing designs and drawings,

24    which it forwarded to Fila on January --

25         THE COURT:  Show me.

M76CkayC

1          MR. GOODMAN:  That's exhibits 35 and 36.  Once we get

2     to issues of performance, your Honor --

3          THE COURT:  Mr. Goodman, let's go very slowly so I can

4     see as you go along.  This is documentary, we have no

5     witnesses, so let me look at the documents.

6          MR. GOODMAN:  Does deposition testimony count, your

7     Honor?

8          THE COURT:  Yes.

9          MR. GOODMAN:  Let me, if I may direct your Honor's

10    attention --

11         THE COURT:  Let me look at 35 and 36 first.  You said

12    it, let me look at it.

13         MR. GOODMAN:  Those are the wrong numbers.  I'm sorry,

14    your Honor.  I apologize.  30 and 31.

15         THE COURT:  Why don't you guys have help with all the

16    things you have to master yourself?

17         MR. GOODMAN:  The associate who was working on this

18    case with me, your Honor, is on her honeymoon.

19         THE COURT:  Okay.  I've got 30.  What do you want me

20    to look at?

21         MR. GOODMAN:  Those are all the drawings and the

22    mockups.

23         THE COURT:  Of what?

24         MR. GOODMAN:  Of the proposed skate program between

25    Fila and Kayo.

M76CkayC

 1              THE COURT:  What did you do with those?

 2              MR. GOODMAN:  We sent them to Fila on January 10th,

 3     2017.  There was a series of emails, your Honor.

 4              THE COURT:  So that's a year and a half into the

 5     agreement.

 6              MR. GOODMAN:  Yeah, but there had never been any

 7     notice.  But when we get into the performance and we call

 8     witnesses -- and why I said we would need witnesses because we

 9     do have testimony --

10              THE COURT:  Let me get some dates clear first.

11              The inception date was when?

12              MS. HEILMAN:  June 15, 2015.

13              THE COURT:  And the first notice given by Kayo about

14     its performance is when?

15              MR. GOODMAN:  Well, the first written notice was

16     January 10th, 2017.  Mr. Morgan is prepared to testify that he

17     was in constant verbal communication with Mr. Epstein of Fila.

18     In fact, there are documents in the record that show that not

19     only were they working on the designs that were transmitted on

20     January 10th, 2017, but they were also recruiting a sponsor for

21     the Fila marks, and we have those documents --

22              THE COURT:  What was the date of termination,

23     Ms. Heilman?

24              MS. HEILMAN:  I believe it was February 10th, 2017.

25              THE COURT:  So one month after you receive Fila's

M76CkayC

1    mockup, you terminate?

2            MS. HEILMAN:  I think, by this point, the ship had

3    sailed for Fila, to be candid.

4            Just to respond to Mr. Goodman's comments about

5    constant contact with Mr. Epstein, that's --

6            THE COURT:  I'm not interested in that.  I'm just

7    focusing on this.

8            So I'm looking at tab 30, Fila's skateboarding product

9    initiatives, February 2016 to January 2017.  So eight months

10   after the inception date, you're getting a pretty full book of

11   products.

12           MS. HEILMAN:  It would be 18 months, your Honor.  And

13   there is no evidence in the record that Fila received this.

14   Fila's witness has a shoe designer, has a vague recollection

15   that he received a package that may have had some sketches in

16   them that showed, in his view, that they had an intent to begin

17   work on the product --

18           THE COURT:  You're saying this document was not

19   received?

20           MS. HEILMAN:  I don't believe that there is any clear

21   recollection that this was received and it's at odds with the

22   testimony in the record with what Fila believe it received.

23           THE COURT:  You believe, Mr. Goodman, it was sent?

24           MR. GOODMAN:  Yes, and we have the documentary

25   evidence and the deposition testimony, your Honor.

M76CkayC

1          Let's start with, if I may, the deposition testimony

2    of the person who was coordinating and who introduced --

3          THE COURT:  You're going to offer that, you're telling

4    me about that.  Is there a document that covers this?

5          MR. GOODMAN:  Email, your Honor, document 12.

6          THE COURT:  Document 12 in your book?

7          MR. GOODMAN:  Yes, your Honor.  There is a series of

8    email communications back and forth --

9          THE COURT:  Wait a minute.  Let's do one at a time,

10   Mr. Goodman, one at a time.

11         This is an email from Mark Eggert.  Who is he with?

12   He is vice president of footwear design and advance concepts of

13   Fila?

14         MR. GOODMAN:  Correct, your Honor.

15         THE COURT:  And he sends it to John Epstein of Kayo.

16         MR. GOODMAN:  Your Honor, 12 is a January 10th, 2017

17   email from Troy --

18         THE COURT:  I've got the wrong -- sorry.  This is from

19   Troy Morgan to Mark Eggert of Fila.  Troy Morgan was Kayo.  Hi,

20   Mark.  It's been a while.  I hope you're good.  I want to reach

21   out and see if we can get the ball rolling again on modifying

22   the Original Tennis and the Original Fitness to be ready to

23   launch and skate.  Not sure how the timing is for you, but we

24   are fully ready with a great game plan.  Please let me know if

25   I can forward you some notes to get started, and maybe we can

M76CkayC

1    jump on a call to go over some details in the notes.

2              This is dated January 10, 2017.

3              MR. GOODMAN:  Correct, your Honor.

4              THE COURT:  This doesn't say they forwarded anything.

5              MR. GOODMAN:  Then you look at the next email, your

6    Honor, which is Mr. Morgan -- I'm sorry.  It is Eggert back to

7    Morgan.

8              THE COURT:  Where do I find that?

9              MR. GOODMAN:  That's 13.

10             THE COURT:  Eggert to Epstein.

11             MR. GOODMAN:  It says I'll be happy to look at the

12   product.

13             THE COURT:  Where?

14             MR. GOODMAN:  The first one.  This is Eggert to

15   Epstein, who is the president, wrote back, said, I'd be happy

16   to look into product again and I asked him if he knew where we

17   stand as far as any contract.  I said I'd be able to chat after

18   we're back from China.

19             THE COURT:  And Mark Eggert, again, is Fila or Kayo?

20             MS. HEILMAN:  He's a shoe designer for Fila.

21             MR. GOODMAN:  He's the head designer.

22             THE COURT:  He's with Fila and he writes to Epstein,

23   who is?

24             MR. GOODMAN:  The president.

25             THE COURT:  Of?

M76CkayC

1          MR. GOODMAN:  Fila.

2          THE COURT:  So this is one Fila person to another?

3          MR. GOODMAN:  Correct.

4          THE COURT:  What do you want me to take from this?

5          MR. GOODMAN:  That, in fact, Mr. Eggert expressed to

6   today Kayo that they were ready to proceed and told Mr. Epstein

7   just that fact.

8          THE COURT:  Mr. Goodman, I don't want you to shift

9   from product to product.  The question I put to you is what

10  proof do you have that that fixed chief of materials, showing

11  product design and the like, is sent on January 10, 2017?

12         MR. GOODMAN:  Tab 16.

13         THE COURT:  Don't tell me the tab, that you don't know

14  for sure.  Is it tab 16 that I'm going to find this?

15         MR. GOODMAN:  Tab 16.

16         THE COURT:  And this is from Eggert to Morgan?  Thanks

17  for following up, we got the package in, looks pretty good.

18  We'll get into it a bit and we'll get back to you as soon as we

19  get something.

20         MR. GOODMAN:  That's it.  That's it.

21         THE COURT:  This is a response to an email of

22  February 7 from Troy Morgan.  Hi, Mark.  Following up again to

23  see if you received a package with notes on the OF and OT.

24         What is OF and OT?

25         MS. HEILMAN:  Original Fitness and Original Tennis.

1    Those are the Fila Heritage shoes.

2            THE COURT:  Does this pertain to that document that

3    was at 40?

4            MR. GOODMAN:  Yes, your Honor.

5            THE COURT:  How do I know it pertains to that

6    document?

7            MR. GOODMAN:  Mr. Eggert's testimony, your Honor.

8            THE COURT:  Where shall I find it?

9            MR. GOODMAN:  So his deposition transcript is at tab

10   28, starting on page 96 and going through page 111.

11           THE COURT:  Where is the testimony about sending that

12   sheath of materials?

13           MR. GOODMAN:  It's page 110, line 17, through page

14   111, line 5, line 10, line 22.

15           THE COURT:  Just a minute.  Don't do that.  Read the

16   testimony into the record that you think is relevant, giving

17   page and line references.

18           MR. GOODMAN:  This is page 110, line 3.

19   "Q.  So at that time, Kayo was communicating to you and sending

20   you mockups and going forward with the process; correct?"

21           MR. GOODMAN:  There was an objection.  Answer over

22   objection.

23   "A.  There was a package there.  To my recollection, I don't

24   believe I received mockups, but I would presume that it was

25   more of competitive samples and evidently a document of some

M76CkayC

1    sort.

2    "Q.  Did -- what was in the package conveyed to you when you

3    received it, the impression that Kayo was working on the file

4    at Kayo project?

5    "A.  I would put it as intent to work on the Kayo Fila project.

6    "Q.  Did you have the same intent as of February 8th, 2017?

7    "A.  Yes.

8    "Q.  When you said the package looks pretty good, was that

9    truthful at the time you said it?

10   "A.  Yes, I have no reason to believe otherwise.

11   "Q.  Now, the next phrase reads, let me get into it a bit and I

12   will get back to you as soon as I get something together.  Do

13   you see that?

14   "A.  Yes.

15   "Q.  What were you going to look into?

16   "A.  From what I gather in looking at the previous exhibit,

17   there were samples of some sort and a document in there,

18   perhaps requesting or suggesting some design ideas to which I

19   would presumably put that information together and submit

20   something back out to Troy.

21   "Q.  And that would be in the normal course?

22   "A.  Yes."

23            THE COURT:  How does that show that there was

24   performance going on by Kayo, which, if you didn't like, you

25   would have to give a notice of some kind of breach and

M76CkayC

1     opportunity to cure?

2          MS. HEILMAN:  I think, by this point, it was too late.

3     I think Mr. Eggert is a shoe designer.  He's not Fila's

4     management.  At this point, Fila's management already had

5     serious concerns about Kayo's performance and believed that the

6     agreement had been abandoned or had been terminated.

7          THE COURT:  Mr. Eggert had been set up to perform with

8     and to work with Kayo.  The notice of termination doesn't come

9     until a month later.  This is January.

10         MS. HEILMAN:  If I could direct your attention back to

11    tab 33 in our binder.

12         THE COURT:  I have it.  What do you want me to take

13    from this?

14         MS. HEILMAN:  This is a January 2016 email where there

15    is some discussion about this other sales agent that Fila

16    ultimately engaged to pursue sales with these retailers, who

17    were skatecentric, that Fila was interested in distributing its

18    skate and non-skate products to.

19         In the context of this email chain, Kayo came up --

20         THE COURT:  Excuse me.  Tell me what I should read.

21         MS. HEILMAN:  You can read the very first page, Bates

22    label 460.  You have Mark Eggert saying, in January of 2016 —

23    now this is only about six months into the agreement — have

24    heard nothing from Troy.  Meaning Troy Morgan, Kayo's

25    president.  Then you have Mr. Epstein, the then president of

1    Fila saying, amazing.  Jennifer, let's discuss.  Whatever
2    happened to Willy Wonka.

3            So this, again, goes back to the representations that
4    Mr. Morgan made at the outset.  There are a number of documents
5    and early communications between Mr. Epstein and Mr. Morgan
6    where Mr. Morgan conveyed he was the Willy Wonka of the
7    skateboarding industry.  There was a sense of fervor and
8    urgency to get this deal done so that he could get to work on
9    these skate products.  So Fila had heard nothing, and this is
10   only six months into the agreement, and they're expressing some
11   surprise.

12           Now fast forward to tab No. 43 --

13           THE COURT:  I'm not finished with tab 33.  Who's Todd
14   and his group?

15           MR. GOODMAN:  That's an important issue --

16           MS. HEILMAN:  Todd Milspa is with the sales agency
17   that Fila ultimately engaged to pursue sales to these
18   skatecentric retailers when Kayo did not perform.

19           THE COURT:  In place of Kayo?

20           MS. HEILMAN:  Correct.  Well, initially, it was
21   supposed to not be in place of Kayo.  They engaged Money Ruins
22   Everything — it's the name of the company — they were going to
23   pursue other retailers, but then when Kayo did not perform,
24   Money Ruins Everything ultimately stepped in and engaged these
25   skatecentric retailers.

M76CkayC

1          MR. GOODMAN:  Your Honor, may I broaden this

2     perspective a little bit and talk about Money Ruins Everything

3     and talk about what really happened?

4          THE COURT:  No.

5          MR. GOODMAN:  Okay.

6          THE COURT:  How do I deal with what Mr. Goodman has

7     presented to me?  Is Mark Eggert not an executive of Fila?

8          MS. HEILMAN:  I believe he had the title of vice

9     president, but he is in footwear designs.  He's not Fila's

10     management, and that's in the record, as well.

11          THE COURT:  Do you have any explanation why he's

12     receiving documents and information from Troy Morgan?

13          MS. HEILMAN:  He would be the person who would have

14     provided comments on a design.  If Mr. Morgan needed some

15     specifications or shoe specifications or design specifications,

16     he would be the person that would provide, because the intent

17     of the agreement was that Kayo was actually going to work from

18     an existing Fila shoe mold.  They weren't going to start from

19     scratch, if you will.  They were going to take the Original

20     Fitness and the Original Tennis shoe and sort of modify the

21     sole of the shoe to make it fit for skateboarding.  So Mark

22     Eggert would have been the point of contact for those types of

23     technical questions.

24          THE COURT:  Mr. Goodman, where is the document we

25     looked at before, the sheath of products and advertising?

M76CkayC

```
 1              MR. GOODMAN:  That's 30 and 31.

 2              THE COURT:  This is all footwear?

 3              MR. GOODMAN:  Yes, your Honor.  There is some

 4    clothing, but it's --

 5              THE COURT:  There is clothing, also?

 6              MR. GOODMAN:  More than two pages, but it's

 7    predominantly footwear.

 8              THE COURT:  So why wasn't this performance under the

 9    agreement?

10              MS. HEILMAN:  I don't know that it's entirely clear

11    from the record or the witness testimony that this is exactly

12    the document that Mr. Eggert received.  And by the pint in time

13    that Mr. Eggert received anything from Kayo, by that point, if

14    Fila's management viewed the contract as having been abandoned

15    or terminated, given the fact that they felt conduct of the

16    licensee was so at odds with the representations and

17    discussions during the negotiation period, which are also

18    reflected in the record.

19              MR. GOODMAN:  Your Honor, this is attorney

20    representation and the underlying evidence is to the contrary.

21              MS. HEILMAN:  It's not --

22              MR. GOODMAN:  February 8th of 2017, Fila received a

23    written confirmation by email from Zumiez that it agreed to

24    enter an agreement with Fila through this MRE.  It is no

25    coincidence that that happened on February 8th and the
```

M76CkayC

1   termination letter got sent on February 10th.

2           THE COURT:  What was the name of that other company?

3           MR. GOODMAN:  Zumiez, Z-u-m-i-e-z.  If your Honor goes

4   back to 2.1, you'll see that Zumiez is one of the three

5   retailers as to which Kayo was entitled to receive commission.

6           THE COURT:  Presumably, because it introduced?

7           MR. GOODMAN:  What's that, your Honor?

8           THE COURT:  Presumably because it introduced Fila to

9   Zumiez?

10          MR. GOODMAN:  Your Honor, it doesn't say that, but on

11  the other hand, there is an email from Mr. Morgan to

12  Mr. Epstein showing him Mr. Morgan's relationship with Zumiez.

13  That is in the latter part of the book, 39, the second page

14  of --

15          THE COURT:  39 only has one?

16          MR. GOODMAN:  Yes.  The second email is from Zumiez to

17  Mr. Morgan about the nature of their relationship.  That's

18  July 21st, 2015.  On July 22nd, 2015 --

19          THE COURT:  Wait a minute.  Tell me where I should go.

20          MR. GOODMAN:  Okay.  This is 39, your Honor.

21          THE COURT:  Number 39?

22          MR. GOODMAN:  Yes.

23          THE COURT:  It's an email.  It's two pages.  It's

24  email traffic between Troy Morgan and Jennifer Lopez.

25          MR. GOODMAN:  No, your Honor.  I know which book, if

M76CkayC

1  you look in plaintiff's book, 39, there are two emails.

2              THE COURT:  Which is your book?

3              MR. GOODMAN:  The one with the orange cover.

4              THE COURT:  Got it, 39.  It's email traffic between

5  Jennifer Lopez and Troy Morgan.

6              MR. GOODMAN:  No, your Honor.  The bottom one is from

7  Josh Birch to Troy Morgan on July 21 --

8              THE COURT:  Is that what you want me to look at?

9              MR. GOODMAN:  Yes.

10             THE COURT:  So let me do it.  What do you want me to

11 take from this document?

12             MR. GOODMAN:  And then look at the one above that by

13 which Mr. Morgan sent this email to Mr. Epstein.

14             What I would like you to take from these documents,

15 your Honor --

16             THE COURT:  This is October 18, 2017?

17             MR. GOODMAN:  No, your Honor.  It's July 21st and

18 July 22nd, 2015.

19             THE COURT:  I see.  So from this, you want me to take

20 that the Zumiez was introduced to Fila by you, by Kayo?

21             MR. GOODMAN:  No, your Honor.  It doesn't say that.

22 What it does say, though, is the relationship between Zumiez

23 and Kayo, the contract does not require --

24             THE COURT:  That's why I would infer that there was an

25 obligation to pay royalties by Fila to Kayo, even though Fila

M76CkayC

 1    sold directly to Zumiez.

 2          MR. GOODMAN:  That's correct, your Honor, without

 3    regard to whether there was an introduction --

 4          THE COURT:  This is not part of our case.

 5          I have to say, Ms. Heilman, from everything I've seen,

 6    you did not comply with the contract to give notice to cure.

 7          MS. HEILMAN:  I think, at a minimum, your Honor, it

 8    would behoove you to hear testimony from the Fila witnesses

 9    about the unique circumstances of this arrangement and why they

10    believed they could invoke section 15.4 and 15.2(i),

11    non-curable material breach.

12          THE COURT:  Were these depositions taken?

13          MS. HEILMAN:  There were depositions taken and there

14    was testimony taken.

15          THE COURT:  Why don't you point me to the depositions.

16          MS. HEILMAN:  Turn to tab 2.

17          MR. GOODMAN:  Whose depositions?

18          MS. HEILMAN:  This is Jennifer Estabrook, who was

19    Fila's then general counsel, who is now Fila's president.

20          MR. GOODMAN:  It's also tab 27 in our book, your

21    Honor.

22          THE COURT:  Please don't do that.

23          MR. GOODMAN:  I'm sorry.  I was just trying to be

24    helpful.

25          THE COURT:  You're not helpful.  Don't interrupt each

M76CkayC

```
1    other.

2               I'm on tab 2, deposition of Jennifer Estabrook.

3               MS. HEILMAN:  So there are several references I'll

4    point your Honor to.  The first one is on page 1 of 3.

5               THE COURT:  Yes.  What do you want me to read?

6               MS. HEILMAN:  Beginning at line 16.  This is

7    Ms. Estabrook responding to, why don't you follow up after you

8    didn't hear back after you sent the email regarding the royalty

9    reporting.

10              THE COURT:  Read the question and answer, please.

11   Where is the question --

12              MS. HEILMAN:  I'm trying to locate the question

13   myself.  I believe it's at the top of page 104.

14              THE COURT:  Top of 104?

15              MS. HEILMAN:  At line 2.

16              THE COURT:  Line 2.

17   "Q.  So is it your testimony that the May 23, 2016 email --

18              THE COURT:  And what was that?

19              MS. HEILMAN:  That's the email she sent inquiring

20   about the contact for royalty reporting almost a year into the

21   agreement when they had heard nothing.

22              THE COURT:  Sorry?

23              MS. HEILMAN:  The email that Ms. Estabrook sent Kayo

24   in May of 2016, approximately a year into the agreement's term,

25   inquiring about the contact for royalty reporting that went
```

M76CkayC

1   unanswered.

2              THE COURT:  Yes.

3   "Q.  So is it your testimony that that email was sent in the

4   ordinary course of business like you would with any of your

5   other licensees?

6   "A.  Yes.  You are mischaracterizing it.  I'm asking for a

7   royalty report because there was no communication from Kayo

8   corporation."

9              THE COURT:  What do you want me to take from this?

10             MS. HEILMAN:  If you continue down to the bottom of

11  page 103, beginning at line 16.

12  "A.  I'm just going to give the same answer.  We are a licensed

13  business..."

14             THE COURT:  That?  So the question is, she's not

15  getting royalties.  So Fila is complaining it's not getting

16  royalties and Kayo is telling us that it's working on

17  development, and if you felt that the development was too slow

18  or that you were entitled immediately to royalties of a certain

19  level, you had to do that.  The agreement doesn't establish a

20  time by which Kayo has to offer sales.

21             MS. HEILMAN:  It doesn't, but the law implies an

22  obligation to act reasonably, and if you hear nothing from your

23  licensee almost a year into the agreement, that's cause for

24  significant concern.

25             THE COURT:  I would agree if you expect royalties

M76CkayC

1    immediately, that will be a concern, but it's also a

2    requirement to give a notice to cure.

3            What in this agreement, Mr. Goodman, tells me that it

4    was an obligation of Kayo immediately to sell and not to

5    develop?

6            MR. GOODMAN:  Nothing, your Honor.  It's quite to the

7    contrary.

8            THE COURT:  Tell me how you read this agreement.

9            MR. GOODMAN:  The very fact that there are no

10   timelines, for one.  There is testimony, there is a letter.

11           THE COURT:  Let's look at the agreement.

12           MR. GOODMAN:  Okay.  There is absolutely no timeline

13   here, your Honor.  Then, if you go to 15, the termination

14   provision, 15.2(vi) says --

15           THE COURT:  Excuse me.  Doesn't 5.1, 5.2, 5.3, and 5.4

16   deal with advertising material which has to precede any

17   effective selling, and the fact that it has to be accepted and

18   approved by Fila suggest that there is a period of development

19   that's involved?  We also know that, up to the time in the

20   agreement, Fila was not selling skateboards and it had no

21   products that was involved in skateboard sales and was looking

22   to Kayo for help to develop products.  That's how I understand

23   this agreement.

24           MR. GOODMAN:  Correct, your Honor.

25           THE COURT:  It would be nice to point me to some

1    testimony that says something like that.

2            MR. GOODMAN:  There is Ms. Estabrook's testimony on

3    page 51, starting at line 7.

4            THE COURT:  Okay.  I'm there.

5    "Q.  To the best of your present recollection, what was

6    discussed about the term of the agreement prior to July 2nd,

7    2015 with the representatives of Kayo in which you participate?

8    "A.  I distinctly remember Mr. Morgan being concerned about the

9    longevity of this agreement.

10   "Q.  To the best of your recollection, what did Mr. Morgan say

11   during these conversations regarding the longevity of this

12   agreement?

13   "A.  I remembered him wanting to make sure that our ability to

14   terminate this license at the end of the initial term was very

15   limited.  I mean -- let me restate that.  He was very concerned

16   that there be an opportunity for him to have control over the

17   renewal of this license.  He did not want to invest time, and

18   effort, and money, and then have us and build up Fila

19   Skateboarding as a brand and have us take it back and take it

20   over."

21           MR. GOODMAN:  There is also a precontract

22   communication between Mr. Morgan and Ms. Blacker and

23   Mr. Epstein, Ms. Estabrook and Mr. Eggert at Fila.  That's

24   document 37 in our book.

25           THE COURT:  Okay.

M76CkayC

1          MR. GOODMAN:  And the penultimate paragraph.

2          THE COURT:  I anticipate the first two years being a

3   lot of marketing work supported by small sales volume and this

4   is why we need this to be a long-term partnership, that one.

5          MR. GOODMAN:  Yes, your Honor.

6          THE COURT:  That's a pretty powerful comment,

7   Ms. Heilman.

8          MS. HEILMAN:  Yes, I think it was contemplated that

9   there would be a development period.  I think this testimony

10   that he just referenced goes back to the idea that Kayo was

11   going to pour all of its energy and effort into building this

12   brand and it pushed for exclusivity, it pushed for a longer

13   term, and that was why it was so shocking to Fila that the

14   performance and the conduct was so at odds with the fervor and

15   the intensity of the negotiation period.

16          THE COURT:  I recognize all that, but that just

17   evidences more the requirement of a notice to terminate, notice

18   to cure.

19          The only thing I find in this agreement that sets a

20   standard of how much selling there should be is in 15.1 where

21   if Kayo does not achieve net sales exceeding $850,000, there is

22   no obligation to extend the initial term of five years, and

23   there is no statement in here that those sales have to be

24   occurring in any particular part of the five-year period.

25          MS. HEILMAN:  That's right, your Honor.  I think --

M76CkayC

1          THE COURT:  The end of the initial term in net sales

2     have to exceed that.

3          MS. HEILMAN:  That's right, but if you're still in the

4     exploratory design phase, this is 18 months in, and this is

5     also testimony of Ms. Estabrook that, by that point, you still

6     have to go through the process of submitting design to Fila for

7     approval, a sample, then have you to go through a four- to

8     six-month period of manufacturing, then a sale period.  So by

9     that point — and this is her testimony — there was no curable

10    breach because, by this point, they didn't have the ability to

11    develop sales within the time period that was contemplated.

12         THE COURT:  Ms. Heilman, from everything that's shown

13    to me so far, this is not a non-curable breach.  This is not

14    within the meaning of 15.2 or the meaning of 15.4(iii).  I have

15    to hold that your termination notice was breached.

16         MS. HEILMAN:  I believe, your Honor, if you look at

17    some of the additional testimony, that this was not just a

18    situation with --

19         THE COURT:  Where do I look?

20         MS. HEILMAN:  On page 121 of Ms. Estabrook's

21    testimony.

22         THE COURT:  Ms. Estabrook was a general counsel,

23    wasn't she?

24         MS. HEILMAN:  She was.

25         THE COURT:  She was not a principle involved in the

```
 1    development of the products.  Her testimony is really hearsay.
 2              What page do you want me to look at?
 3              MS. HEILMAN:  Page 121.  She served in dual roles.
 4    She was a business person and general counsel.  She was --
 5              THE COURT:  But there's no evidence --
 6              MS. HEILMAN:  -- licensing since 2007.
 7              THE COURT:  There was no evidence that she was charged
 8    in the actual production.
 9              Page 121, I have it.
10              MS. HEILMAN:  So she's talking about at line 13.  I'm
11    sorry.  If you scroll up to line 4, in the fall of 2016, we
12    were discussing the absence of Kayo.  And then if you scroll
13    down to line 13, the gist of the conversations were that Troy
14    basically had disappeared shortly after we signed the contract
15    and that there had been various reach-outs that were
16    unresponded to.  And then we heard -- we were curious as to why
17    somebody who was so dead set on getting this license and
18    protecting it and worrying about the term and not protecting
19    what he was going to build would go completely dark for such a
20    long period of time.  So we were discussing and then we heard
21    that the reason was because he didn't have financing --
22              THE COURT:  -- the testimony.  The gist of the
23    conversations, these were internal conversations at Fila.  The
24    gist of the conversations were that Troy — I guess that means
25    Troy Morgan of Kayo — basically had disappeared shortly after
```

M76CkayC

we signed the contract and that there had been various

reach-outs that were unresponded to.  And then we heard -- then

we were curious as to why somebody who was so dead set on

getting the license and protecting it and worrying about the

term and not protecting what he was going to build would go

completely dark for such a long period of time.  So we were

discussing and then we heard that the reason was because he

didn't have financing.  So we were discussing what to do at

that point in time.

You know, again, this is something that you put to the

other party.  Let me see your production schedule, let me see

that you have adequately financed this, but you didn't.

In any event, Ms. Estabrook is a general counsel who

justified the termination and she's not a principal who has

knowledge, really.

I have to repeat, I have to find that the termination

was a breach.

Let's go on the next question.  How do you prove your

loss commissions?

MR. GOODMAN:  Thank you, your Honor.  There are two

other elements of damage beyond the loss commission, one is for

the renewal period and the other is factual out-of-pocket

expenses.

THE COURT:  Well, you have to prove that you would

reach $850,000 in net sales.

M76CkayC

1            MR. GOODMAN:  Correct, your Honor.

2            THE COURT:  So let's look at the additional period

3       first.  How do you prove lost commissions in the initial

4       period?

5            MR. GOODMAN:  We have an expert report, your Honor.

6       The expert report is document 32, and the expert computes the

7       actual loss commissions at page 25 of 35 of his report.  Now,

8       that's virtually illegible to my eyes.  So we have reproduced,

9       your Honor, for ease of reference in a blowup that is

10      significantly more legible, if I may hand it up.

11           THE COURT:  Tell me, in words first, where are we.

12           MR. GOODMAN:  Document 32.

13           THE COURT:  I have that.

14           MR. GOODMAN:  Page 25 of 35.

15           THE COURT:  So these are a set of projections, I'm

16      sure.

17           MR. GOODMAN:  No, these are actuals, your Honor.

18           THE COURT:  These were actual sales?

19           MR. GOODMAN:  Correct, your Honor.

20           THE COURT:  What do they show?  I can't read this.

21           MR. GOODMAN:  It shows actual commissions at 7 percent

22      due on actual sales for the initial term of $761,411.24.

23           THE COURT:  $761,411 and?

24           MR. GOODMAN:  24 cents.

25           THE COURT:  Any comment about that figure,

M76CkayC

1    Ms. Heilman?

2              MS. HEILMAN:  So the commissions are obviously a

3    percentage of Fila's net sales, so there is really not much to

4    dispute here, but for whatever reason, our calculations are

5    different.  We have 732 or thereabouts.  I believe there was a

6    brief period before the expiration of the initial term where we

7    didn't have actual sales, so it could be a difference of

8    projections.  We probably just have to reconcile the

9    differences.

10             THE COURT:  Mr. Goodman is saying these are not

11   projections, they were actual sales.

12             MS. HEILMAN:  I can't explain the discrepancy, but we

13   worked from Fila's own members with Fila's personnel who are in

14   the business of computing commissions, and that's their job,

15   and they calculated a different number.

16             THE COURT:  Can you explain your calculation.

17             MS. HEILMAN:  7 percent of net sales to a non-Fila --

18   actually, it's possible.  I believe some initial spreadsheets

19   that were produced included some products that were, I think,

20   not supposed to be included.  It was only supposed to be

21   non-Fila products and there was some sales maybe to Canada that

22   were included.  So I do believe that there are some

23   discrepancies that could be ironed out.  Our sales, we verified

24   and reverified --

25             THE COURT:  So there is some number between $732,000

M76CkayC

```
 1  and $761,000 that would reflect the loss commissions not paid
 2  to Kayo?
 3          MS. HEILMAN:  For the entire term.  But I don't know
 4  that you would automatically find that he was entitled to
 5  commissions for the entire term, I think perhaps up to the
 6  termination date.  I mean, the termination was the termination
 7  and --
 8          THE COURT:  There was a duty to mitigate.
 9          MS. HEILMAN:  I believe that there was a duty to
10  mitigate and this is a windfall situation, right?  He didn't do
11  the work to introduce --
12          THE COURT:  Have either of you briefed that issue?
13          MS. HEILMAN:  Excuse me?  I'm sorry.
14          THE COURT:  Have either of you briefed that issue,
15  whether --
16          MS. HEILMAN:  No.
17          THE COURT:  -- there was?  Was this contract supposed
18  to be an exclusive on the part of Kayo, meaning that it could
19  not manufacture for others?
20          MS. HEILMAN:  Kayo was given the exclusive right to
21  manufacture skate products only.
22          THE COURT:  But was it allowed to expand its business
23  and deal with others?
24          MS. HEILMAN:  Beyond the authorized distribution
25  channels in the agreement?
```

M76CkayC

1                THE COURT:  Different product, for example.

2                (Indiscernible crosstalk)

3                MR. GOODMAN:  Your Honor eliminated all those damages

4      by --

5                THE COURT:  Would you please answer my question.  What

6      was Kayo's business?

7                MR. GOODMAN:  Kayo's business was skateboards, the

8      sale, distribution of skateboards and attendant products.  The

9      sales to Zumiez and Tilly's, the three outlets that we're

10     talking about, that was on any product that was sold by Fila to

11     those three outlets.

12               THE COURT:  You calculated that?

13               MR. GOODMAN:  Yes.  So the total sales based on

14     discovery, based on Fila's sales to Zumiez, Tilly, and PacSun

15     totaled $10 million during the first term, not counting any

16     renewals, during the first term totaled $10,877,303.49.

17               THE COURT:  You're entitled to 7 percent of that?

18               MR. GOODMAN:  Yes, your Honor.

19               THE COURT:  And you calculated that?

20               MR. GOODMAN:  Yes, your Honor, and it's $761,411.24.

21               THE COURT:  So that's the number you gave me before?

22               MR. GOODMAN:  Yes, your Honor.

23               THE COURT:  So that $761,411 is the sum of the

24     commissions that you were supposed to get?

25               MR. GOODMAN:  During the first term, during the

M76CkayC

1    initial term.

2                THE COURT:  Weren't you required to pay commissions to

3    Fila?

4                MR. GOODMAN:  No, your Honor.  That was on something

5    different.  Your Honor already has eliminated that aspect of

6    the case in your *in limine* rulings.  We were supposed to pay

7    Fila a royalty on Fila-branded skateboard products, but those

8    never went to market because of what we were talking about

9    during the course of this afternoon, the submission and

10   approval and so forth.

11               So there are two separate buckets here in 2.1, your

12   Honor.  The one bucket, what we're talking about, is the sales

13   that Kayo would have had of the Fila-branded merchandise.

14               THE COURT:  How much was that?

15               MR. GOODMAN:  Your Honor eliminated that.  Your Honor

16   knocked that out as being too speculative.

17               THE COURT:  I knocked out your claim for damages?

18               MR. GOODMAN:  No, you knocked out my claim for lost

19   profits, your Honor.

20               THE COURT:  We're talking about commissions.

21               MR. GOODMAN:  But the commissions are not on that

22   breach.  The commissions are on the Zumiez, Tilly's, and PacSun

23   sales of any Fila product by Fila, and that's the $761,000

24   number that we've been talking about.

25               THE COURT:  Excuse me one moment.

M76CkayC

|     |                                                                        |
| --- | ---------------------------------------------------------------------- |
| 1   | (Pause)                                                                |
| 2   | So the damages are between $732,000 and $761,000 for                   |
| 3   | the loss commissions and I will give you an opportunity to work        |
| 4   | out the precise number                                                 |
| 5   | MS. HEILMAN:  Your Honor, I just clarify that, would                   |
| 6   | your Honor consider that the damages should be the commissions         |
| 7   | that were earned up until the termination?  I mean, this is in         |
| 8   | the provision --                                                       |
| 9   | THE COURT:  This is the initial term.                                  |
| 10  | MS. HEILMAN:  No, I'm talking about up until 2017 of                   |
| 11  | February when the agreement terminated.                                |
| 12  | MR. GOODMAN:  Your Honor has already ruled that the                    |
| 13  | termination was a breach.                                              |
| 14  | THE COURT:  Just a minute.  If you mean up to the                      |
| 15  | termination date, no.  If your termination is a breach, they're       |
| 16  | entitled to commissions through that initial period, all sales         |
| 17  | you made to the three companies, and you said you calculate            |
| 18  | about $732,000.  Mr. Goodman has a calculation that he's given         |
| 19  | to you of $761,000.  If you take issue with anything in there,         |
| 20  | I'll give you some time to work it out, otherwise you'll be            |
| 21  | liable for $761,411.24 plus interest.                                  |
| 22  | Is there an interest figure in the agreement?                          |
| 23  | MR. GOODMAN:  No, your Honor, not for this.  But there                 |
| 24  | was a motion made to strike a claim for interest, which your          |
| 25  | Honor denied.  New York legal rate is 9 percent.  Our expert          |

M76CkayC

1    did a 20-percent calculation.

2            THE COURT:  I'm bound to give 9 percent?

3            MR. GOODMAN:  Yes.

4            THE COURT:  What binds me to give 9 percent?

5            MR. GOODMAN:  It is a diversity case, your Honor,

6    9 percent is the New York legal rate under the CPLR.

7            THE COURT:  Does diversity carry forward with

8    interest?

9            MR. GOODMAN:  The interest runs from the date that the

10   commission should have been paid, which is within 30 days.

11           THE COURT:  I'd like to see some law that binds me to

12   9 percent.

13           MR. GOODMAN:  Sure.

14           THE COURT:  How much is the figure at 9 percent?

15           MR. GOODMAN:  $177,286.  So our total with interest on

16   loss commission incomes for the initial term comes out to

17   $938,697.

18           THE COURT:  Okay.

19           MR. GOODMAN:  Then there was $21,961 of out-of-pocket

20   expenses.

21           THE COURT:  Where are you allowed to recover?

22           MR. GOODMAN:  So there was on standard breach of

23   contract damages to be made whole in reliance on the licensee

24   agreement.

25           THE COURT:  What in the licensee agreement covers this

M76CkayC

1    point?

2              MR. GOODMAN:  No, the licensee agreement does not,

3    your Honor.

4              THE COURT:  So why are you entitled to it?

5              MR. GOODMAN:  Because under New York law, breach of

6    contract damages is to put the plaintiff in the position, as

7    you know, as it would have been had the contract been

8    performed.  That flowed directly from the breach.

9              THE COURT:  So what in the contract gives you

10   entitlement to those kinds of expenses?

11             MR. GOODMAN:  No, your Honor, but it doesn't bar it

12   either.

13             THE COURT:  So why are you telling it to me if there

14   is no authorization in the contract for it?

15             MR. GOODMAN:  Because it's the direct and natural

16   consequence of the breach, your Honor.  Without the breach,

17   that $21,000 would not have had to have been paid.

18             THE COURT:  What makes up this $21,000?

19             MR. GOODMAN:  It was a payment made to a skateboarder

20   with whom Kayo had entered into an agreement to sponsor the

21   Fila-Kayo skateboard product.  That agreement is in --

22             THE COURT:  Wasn't that something that was required to

23   be done by Kayo under the contract?

24             MR. GOODMAN:  It was not required, your Honor.  It was

25   part of the overall strategy --

M76CkayC

1          THE COURT:  -- marketing --

2          MR. GOODMAN:  Yes.

3          THE COURT:  And you were compensated by commissions.

4    I hold that you're not entitled to that amount.

5          MR. GOODMAN:  Then what's left is the renewal period.

6          THE COURT:  Now how do you prove you have exceeded

7    $850,000 in net sales?

8          MR. GOODMAN:  In January of 2016, contemporaneously,

9    Kayo also entered into a similar collaboration with Adidas.

10   That collaboration is not in the record.  It was in the

11   documents we provided at document No. 26 and based on the sales

12   information that's part of No. 26, the sales information, it

13   was a three-month period, the sales information appended to the

14   agreement in No. 26.  The expert reviewed and calculated at

15   $354,000 for one quarter.  So now we're looking at, if you take

16   one quarter in U.S. sales of $354,000 in the Adidas deal, one

17   year, that would have been $1.4 million and change, and five

18   years of that would have been $7 million-plus.

19         THE COURT:  Now the agreement, tell me if I'm right,

20   talks about $850,000 of net sales in the final year of the

21   initial term; am I right?

22         MR. GOODMAN:  I'm double checking, your Honor.  I

23   don't want to guess.

24         THE COURT:  It says, provided that in the event that

25   at the end of the initial term the net sales of the products

M76CkayC

exceeds $850,000.

        MR. GOODMAN:  Yes.  So it's for the entire initial

term, your Honor, not just the last year.

        THE COURT:  Ms. Heilman.

        MS. HEILMAN:  The Adidas-DGK comparison is not a valid

comparator.

        THE COURT:  Let's interpret this agreement first.

        MS. HEILMAN:  I don't read it as requiring $850,000 in

the last year, I just read it as requiring $850,000 in sales in

the initial term.  And there is no factual predicate that they

would have achieved that because there were no skate products

ever developed, and you can't rely on sales of Adidas.  Adidas

is not on the same footing of Fila, it's a massive company.

There is also sales under the DGK brand, which is a very well

established skate brand that's been around for decades.  That's

Kayo's brand, is the DGK brand.  So you can't compare sales by

Kayo of new Fila skate products that consumers have never heard

of with sales of DGK products by Adidas.

        THE COURT:  DGK is Kayo?

        MS. HEILMAN:  That's their brand.  So they were

co-branded with the Adidas logo.  So they were Adidas-DGK

co-branded products sold and manufactured by Adidas.

        THE COURT:  So your argument is there is no separate

selling shown by DGK?

        MS. HEILMAN:  So there were no sales under this

1    agreement.  So what they did is they used the Adidas DGK

2    collaboration, a separate agreement as a yardstick to

3    extrapolate and project hypothetical sales under this

4    agreement.  I'm saying you can't do that --

5            THE COURT:  Had they been performed or been allowed to

6    perform your agreement, would they also have been able to

7    perform for Adidas?

8            MS. HEILMAN:  It's completely speculative.  I mean,

9    it's apples and oranges.

10           THE COURT:  Is there anything that barred them from

11   their agreement with Adidas if they were to continue to perform

12   under the license agreement?

13           MS. HEILMAN:  No.  I think, potentially, they may have

14   been barred under their Adidas agreement, but think it's --

15           THE COURT:  I don't think mitigation is applicable.  I

16   think they're entitled to the full loss commissions and I'm

17   still on this question, we're still on this issue of whether or

18   not there was or could be a successive term based on the level

19   of net sales.  I don't think, Mr. Goodman, that your production

20   for Adidas is comparable.  I don't think it's of evidentiary

21   value.

22           MR. GOODMAN:  Your Honor, given that the defendant's

23   breach foreclosed any performance under the initial term of the

24   agreement, we can't look to anything involving Fila in the

25   skateboard market.

M76CkayC

1        Secondly, as your Honor knows, apparently the analogue

2    doesn't have to be specific, it just has to be to a reasonable

3    degree of certainty if we were dealing here with a close

4    question.  If we're talking if the Adidas net sales would have

5    been, let's say, a million over a five-year period, then he had

6    you to do a close calculation, it becomes a tougher comparison.

7    If we're looking for a reasonable predicate, a reasonable basis

8    and remembering that the inferences are construed against the

9    party breaching the agreement, since the Adidas number would

10   have come to, over five years, over $7 million, and we're

11   talking roughly 10 percent, is it a reasonable basis under

12   these facts and circumstances, given that the breach by Fila

13   made a more specific comparison possible, is it a reasonable

14   basis to say that they would have done with Fila approximately

15   10 percent of what they did with Adidas?  I think that's a

16   fairly safe assumption.

17       THE COURT:  I recognize the presumptions and the

18   assumptions, but damages also have to be proved.  I have no

19   ratios to work on between Fila's sales and Adidas's sales.  I

20   can't tell whether they're comparable, whether Adidas is a much

21   more marketable item than Fila, I can't decide on the market

22   penetration, and I can't make any comparison between what you

23   did with Adidas and what you did with Fila.  I am not able to

24   say that the net sales would have exceeded $850,000 for the

25   initial term and you had no right to a successive term, unless

M76CkayC

1    you exceeded $850,000 in net sales.

2              Accordingly, I hold that you are not entitled to loss

3    commissions in the renewal period.  So your total damage,

4    subject to further working with Ms. Heilman, is $938,697.  When

5    you submit any agreement, I will grant judgment for that

6    amount.

7              So I find that this agreement is the entire agreement

8    of the parties.  The arguments in the counterclaims for fraud

9    in the inducement are outside this agreement and not

10   contemplated by this agreement, and that this agreement is the

11   entire agreement between the parties.  It has no room for fraud

12   in the inducement.

13             Under this agreement, the termination rights to

14   non-curable breaches are limited and defined that the slowness

15   in production complained of by Fila were curable, at least Kayo

16   had the right to try to cure within the 45-day period provided

17   in the agreement, and that termination without a right to cure

18   under paragraph 15.1, 15.2, and 15.4 was not appropriate and

19   was a breach.  Fila has not been able to show that it had good

20   reason for all this treatment of any slowness on the part of

21   Kayo as a non-curable breach under 15.4.  And it fails on its

22   burden to show that its actions were reasonable.

23             Moreover, the instances of what is a curable breach

24   set out in seven subparagraphs under 15.2 cover the items sold

25   here.  Subparagraph 4, failing to submit the licensor for its

1     prior approval any product, advertising material, or plan and

2     failure to fulfill any of the material obligations under the

3     agreement.

4          The evidence shows that a full package of materials

5     for the development and sale of the shoes that were a key part

6     of the product was submitted January 10 of 2017, that there

7     were conversations back and forth about it, which were boarded

8     by the notice of termination on February 10, 2017, and whether

9     it was a reflection of what Fila might have thought was a more

10    favorable deal with another company or exasperation with Kayo

11    is not important.  What is material is that Kayo had right to a

12    45-day period to cure and it was not given this right.

13    Accordingly, I hold that Fila breached the contract.

14         I had held previously that Kayo was not entitled to

15    lost profits, and I incorporate here my findings and

16    conclusions in that previous decision.

17         I hold that Kayo is entitled to prove its lost

18    commissions on sales directly made by Fila through the three

19    companies mentioned in the agreement, that the total is

20    $761,411.24 subject to any correction on the part of Fila, at

21    9 percent interest, which is the state rate of interest, is

22    appropriate, again, subject to being shown by Fila that a

23    lesser rate is the correct rate, and that the total of the loss

24    commissions and the interest is $938,697.

25         I'll give the parties a week to work out any

M76CkayC

|    |                                                                            |
|----|----------------------------------------------------------------------------|
| 1  | disagreements, and if there can't be a workout, Kayo should                 |
| 2  | submit a form of judgment giving it the amount I mentioned                  |
| 3  | $938,697 inclusive of interest.  It should break out the                    |
| 4  | principal and the interest.                                                 |
| 5  |          Anything further, Mr. Goodman?                                     |
| 6  |          MR. GOODMAN:  No, your Honor.  Thank you very much.                |
| 7  |          THE COURT:  Ms. Heilman?                                           |
| 8  |          MS. HEILMAN:  Just in the event that Kayo does not                 |
| 9  | accept our correction, is there a mechanism by which we could              |
| 10 | raise that with the Court?                                                  |
| 11 |          THE COURT:  Yes, the mechanism is my individual rule              |
| 12 | 2.E.  Write me a joint letter within that week giving me your              |
| 13 | respective positions and I will rule upon it and, if necessary,           |
| 14 | call you for an oral argument to explain the positions.                    |
| 15 |          MS. HEILMAN:  And that goes both to the commissions               |
| 16 | and the availability and amount of interest?                               |
| 17 |          THE COURT:  Yes, everything having to do with damages.            |
| 18 |          I thank you very much.  My only observation is that               |
| 19 | you took upon yourselves much too much work, you need help.                |
| 20 |          I'm returning these books.                                        |
| 21 |                              * * *                                         |
| 22 |                                                                            |
| 23 |                                                                            |
| 24 |                                                                            |
| 25 |                                                                            |